**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DARONTE BROWN;**       : | |
|       : | **Case No. 2:25-cv-01275** |
|    **Plaintiff,**       : | |
|       : | |
|    **v.**       : | |
|       : | |
| **ROBERT VEITH, Corrections Officer;**       : | **ELECTRONICALLY FILED** |
| **CHRISTOPHER RADACI, Sergeant;**       : | |
| **MIGUEL MCKINLEY, Corrections Officer;**       : | |
| **JOHN DOES #1-4, Corrections Officers;**       : | **JURY TRIAL DEMANDED** |
| **JOHN DOE #5, Corrections Officer;**       : | |
| **ORLANDO HARPER, Warden of Allegheny**       : | |
| **County Jail; SHANE DADY, Interim Warden;**       : | |
| **JASON BEASOM, Deputy Warden;**       : | |
| **ALLEGHENY COUNTY**       : | |
|    **Defendants.** | |

**SECOND AMENDED COMPLAINT**

Pursuant to Fed. R. Civ. P. 15(a)(2), Plaintiff files this Second Amended Complaint, to which Defendants do not object.

**INTRODUCTION**

1. Plaintiff Daronte Brown, a 21-year-old pretrial detainee with well-documented and severe psychiatric disabilities, brings this lawsuit to assert violations of his constitutional and human rights. During his incarceration at Allegheny County Jail ("ACJ"), Mr. Brown was unlawfully assaulted twice. For both assaults, Mr. Brown was restrained and experiencing overwhelming and apparent mental health symptoms. Nevertheless, Defendants Corrections Officer ("CO") Robert Veith, Sergeant ("Sgt.") Christopher Radaci, and other officers acting

1

under the authority of Allegheny County brutally assaulted and tased the cuffed Mr. Brown. Similarly, about four months before this assault, several corrections officers viciously punched and kicked Mr. Brown while he was subdued and in the throes of a mental health episode after he complained about a nurse refusing to replace his psychiatric medications that she had knocked to the floor.

2.    Defendant Veith's beating of Mr. Brown was so egregious that the County Police and District Attorney's Office pursued charges against him related to the assault. Defendant Veith pled guilty to a lesser charge and was convicted for his conduct in assaulting Mr. Brown. Defendant Radaci, who tased Mr. Brown, and about a half a dozen officers who assaulted him the prior year were not internally disciplined by the jail or criminally charged.

3.    The assaults on Mr. Brown stemmed from a culture of violence at ACJ, which was promulgated by Supervisory Defendants Warden Orlando Harper, Interim Warden Shane Dady, and Deputy of Operations Jason Beasom ("Supervisory Defendants"), who failed to adequately train, supervise and discipline ACJ correction officers for such conduct, which resulted in the rampant use of unlawful and unconstitutional force on people incarcerated at ACJ.

4.    As a result of the egregious and unchecked excessive force against individuals with disabilities at ACJ, Mr. Brown has suffered serious physical and psychological injuries, some of which are permanent in nature.

## JURISDICTION AND VENUE

5.    This case is brought pursuant to the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202, the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*.

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 1367(a).

7.      This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in Allegheny County, in the Western District of Pennsylvania.

## PARTIES

8.      Plaintiff Daronte Brown is a pretrial detainee incarcerated at ACJ. Mr. Brown has an anxiety disorder, depression, post-traumatic stress disorder ("PTSD") that have been well-documented in his medical records, and for which he was prescribed the medications Buspar and Remeron. Mr. Brown was assaulted by ACJ corrections officers in August 2023 and again in January 2024.

9.      Defendants John Does #1-4 were at all relevant times employees of Allegheny County, serving as corrections officers at ACJ. At all relevant times, Defendants John Does #1-4 were acting under color of state law, and in accordance with the policies, customs, and/or practices of Allegheny County. They are sued in their individual capacities.

10.     Defendant John Doe #5 was at all relevant times an employee of Allegheny County, serving as corrections officer at ACJ. At all relevant times, Defendant John Does #5 was acting under color of state law, and in accordance with the policies, customs, and/or practices of Allegheny County. He is sued in his individual capacity.

11.     Defendant Miguel McKinley is and was at all relevant times an employee of Allegheny County, serving as a corrections officer at ACJ. At all relevant times, Defendant McKinely was acting under color of state law, and in accordance with the policies, customs, and/or practices of Allegheny County. He is sued in his individual capacity.

12.     Defendant Robert Veith was at all relevant times an employee of Allegheny County, serving as a corrections officer at ACJ. At all relevant times, Defendant Veith was acting under color of state law, and in accordance with the policies, customs, and/or practices of Allegheny County. He is sued in his individual capacity.

13.     Defendant Christopher Radaci is and was at all relevant times an employee of Allegheny County, serving as a sergeant at ACJ. At all relevant times, Defendant Radaci was acting under color of state law, and in accordance with the policies, customs, and/or practices of Allegheny County. He is sued in his individual capacity.

14.     Defendant Orlando Harper was at all relevant times the Warden at ACJ up to September 2023 and as such was responsible for the oversight, operation and administration of ACJ, including security and use-of-force policies and practices, staff training, and ensuring accommodations for incarcerated people with physical or psychiatric disabilities. At all relevant times, Defendant Harper was acting under color of state law, and in accordance with the policies, customs, and/or practices of Allegheny County. He is sued in his individual capacity.

15.     Defendant Shane Dady was the Warden at ACJ between September 2023 and November 2024. He was responsible for the oversight, operation and administration of ACJ, including security and use-of-force policies and practices, staff training, and ensuring accommodations for incarcerated people with physical or psychiatric disabilities. At all relevant times, Defendant Dady was acting under color of state law, and in accordance with the policies, customs, and/or practices of Allegheny County. He is sued in his individual capacity.

16.     Defendant Jason Beasom was at all relevant times the Deputy Warden of Operations at ACJ. He is responsible for oversight, administration, investigation, and discipline of corrections officers for uses of force on incarcerated people confined at ACJ. At all relevant

times, Defendant Beasom was acting under color of state law, and in accordance with the policies, customs, and/or practices of Allegheny County. He is sued in his individual capacity.

17.    Defendant Allegheny County is a county government organized and existing under the laws of the Commonwealth of Pennsylvania. Defendant Allegheny County is in possession and control of ACJ.

## STATEMENT OF FACTS

### *ACJ's Culture of Violence Against Individuals with Psychiatric Disabilities*

18.    More than 60% of the people incarcerated in ACJ have a serious mental illness and/or psychiatric disability.

19.    Prior to 2023, the National Commission on Correctional Health Care ("NCCHC") repeatedly found that ACJ failed to provide adequate treatment plans, screening, monitoring and other evidence-based mental health procedures that were compliant with correctional healthcare standards, which affected individuals with psychiatric disabilities.

20.    For years, ACJ has outpaced all other jails in Pennsylvania in uses of force, deployment of weapons, deaths, and use of solitary confinement per capita. These horrendous statistics were and are, in part, a product of the unmet need for mental healthcare at ACJ.

21.    Chronic staffing vacancies further impeded the administration of healthcare to people incarcerated in ACJ.

22.    ACJ staff frequently ignore or deny requests for help from incarcerated individuals with psychiatric disabilities and subject those individuals to repeated use of brutal force.

23.    ACJ's officers routinely assaulted people with psychiatric disabilities in response to their need for psychiatric care. This has occurred without oversight, and often in situations where the person being assaulted has already been subdued or restrained.

24. Rather than contacting mental health staff, a pattern and practice has existed at ACJ of using force in response to mental health needs. Even ACJ's past policies that recognized the need for mental health intervention have been inconsistent and disregarded by officers and officials, including when there was no urgent need for force between officers and incarcerated individuals.

25. ACJ policies identified two use-of-force situations for corrections officers: planned and unplanned. A planned use of force refers to a situation where the incarcerated person "does not pose an immediate risk" of harm to himself or others and "he[ ] is secured in a location allowing supervisory staff the time to plan the use of force." An unplanned use of force refers to "[s]ituations in which immediate force is used to prevent injury" to the incarcerated person and others. Corrections officers were required to seek the assistance of healthcare professionals to help de-escalate and use non-force alternatives to avoid the use of excessive force. Later investigations revealed that the majority of the time little to no de-escalation efforts were used by healthcare or corrections staff.

26. ACJ corrections officers frequently used force in response to non-emergency, non-violent situations, often involving an incarcerated person with psychiatric disabilities. Corrections officers routinely used force on people with psychiatric disabilities as a method of first response without seeking intervention from mental health staff, even when the persons involved did not present a risk of harm to themselves or others.

27. At all relevant times, ACJ corrections officers used force without effective oversight. The Supervisory Defendants condoned virtually all uses of force by officers, rarely if ever disciplined officers for their use of force and failed to properly investigate allegations of physical abuse.

- In 2019, several times, correction officers unlawfully used force on Ms. Kimberly Andrews, who has a psychiatric disability and was experiencing a mental health crisis. But the officers, including Defendant Radaci, were not disciplined. In one incident, Ms. Andrews was thrown to the floor while she was already restrained by four officers for non-violent behavior. Another time, Ms. Andrews was handcuffed as she was tased after just returning from a hospital for a suicide attempt.[1]

- Bradford Hanson, an expert in uses of force and a former warden, found corrections officers and their supervisors at ACJ engaged in a pattern and practice of using physical force and weapons excessively and without penological justification in dozens of incidents that occurred between 2017 and 2021.[2] Mr. Hanson was retained as a Plaintiffs' expert in a class action lawsuit involving the use of excessive force at ACJ. Serving as an expert, Mr. Hanson reviewed use of force reports, watched surveillance footage of uses of force, and reviewed records concerning incarcerate people's psychiatric diagnosis. Mr. Hanson concluded that nearly all incarcerated persons who were a victim of force had psychiatric disability and that the force used was excessive. In many of these instances, the

---

[1] Bradford Hansen Report at 14-16, 30-34, *Andrews v. Harper*, No. 2:19-cv-00670-CWW (Aug. 4, 2021), ECF. 106-1; Paula Ward, *Pittsburg-area Woman Decries Use of Force at Allegheny County Jail*, TRIBLIVE (July 23, 2021; 11:00 AM), https://triblive.com/local/pittsburgh-area-woman-decries-use- of-force-at-allegheny-county-jail/.

[2] Bradford Hansen Expert Report, *Howard v. Williams*, No. 2:20-cv-01389-LPL (Feb. 15, 2023), ECF. 97; An-Li Hering, Class-Action Lawsuit Alleges Abuse of Allegheny County Jail Inmates with Psychiatric Disabilities, WESA (Sept. 15, 2020), https://www.wesa.fm/identity-justice/2020-09-15/class-action-lawsuit-alleges-abuse-of-allegheny-county-jail-inmates-with-psychiatric-disabilities; Bradford Hansen Report, *Walker v. Raible*, No. 2:28-cv-01868 (Jan. 31, 2023); Claudia Lauer, Female Ex-Inmates Allege Excessive Force At Allegheny County Jail, WESA, (Dec. 2, 2020, 2:47 PM EST), https://www.wesa.fm/identity-justice/2020-12-02/female-ex-inmates-allege-excessive-force-at-allegheny-county-jail.

incarcerated person was already restrained or subdued when the officers used force on them.

- Around July 2023, Mr. Kush Wilkerson was assaulted by several officers and tased by Sgt. Sarver. [3]

28.     Over the years, Supervisory Defendants failed to prevent unlawful assaults by conducting inadequate investigations of Defendant officers' uses of force. Additionally, the County failed to adequately train and supervise Supervisory Defendants' and correctional officers, and condoned the practice of inadequately investigating use of force incidents by officers at ACJ.

29.     Although dozens of grievances, use of force packets, and surveillance videos showed that Defendant officers used force excessively, the County and Supervisory Defendants refused to train, supervise, or discipline them despite knowing there would be more instances where Defendant officers would encounter incarcerated persons with psychiatric disabilities and use unwarranted force against them.

30.     Ultimately, the unjustifiable discrimination against people with psychiatric disabilities at the ACJ culminated in a class action lawsuit, *Howard v. Williams*, in 2020. The *Howard* case successfully challenged the unlawful use of force, solitary confinement, and mental health policies, practices, and procedures that were entrenched in ACJ.

31.     In May 2021, Allegheny County voters passed a referendum that banned most forms of solitary confinement at the ACJ as well as the use of several weapons, including chemical agents and the restraint chair.

32.     In 2021, the ACJ enacted a Mental Health Tier system created to subject

---

[3] Complaint, *Wilkerson v. Sarver*, No. 2:25-cv-00919 (July 2, 2025), ECF. 1.

incarcerated persons with disabilities to more adverse restrictions and deprivations. The system defied correctional care standards because the policy permitted keeping people with psychiatric disabilities in cell by themselves even if they were not exhibiting suicidal or self-harm behavior.

33.     Although the Mental Health Tier system ranges 1-5 with the 5th tier having the most deprivations, the reality is that all tier patients are denied conditions and privileges, including recreation, exercise, visits, calls to family and friends, and meaningful social interaction. To date, jail officials have failed to present any scientific-based evidence to support the system, which likely violates the Referendum and the Consent Order in *Howard v. Williams*.

34.     Shortly after the Referendum's passage, another effort arose to undermine the citizen created law and to discriminate against incarcerated people with disabilities. Former Warden Harper and the County contracted Corrections Special Application Unit ("CSAU"), a militaristic training program for correction officers that was directed by disgraced charlatan Joseph Garcia.

35.     Mr. Garcia had been hired to train officers who were deployed to respond to incarcerated persons experiencing a mental health crisis. Assessments by corrections experts, lawsuits, and former trainees confirmed that Garcia provided no meaningful training on de-escalation and in fact teaches aggression and intimidation techniques

36.     Experts, investigators, and journalists found that Mr. Garcia improperly taught officers to profile incarcerated people and determine which mental health condition they have. Mr. Garcia also taught officers to use inappropriate terminology by referring to incarcerated person with an intellectual disability as "mentally retarded." [4] In addition, Garcia ingrained the

---

[4] Gary Raney, USE OF FORCE ANALYSIS RELATED TO THE DEATH OF JAMAL SUTHERLAND, at

9

idea that disabled individuals are violently mentally ill and that officers should gain compliance through aggression and shouting oral commands instead of using a calming tone and building a conversation with the persons. [5] Mr. Garcia trained officers to view pretrial detainees as "enemies" and to see it as their job to engage in "combat", "fight", and "going to battle with" so-called "enemies," i.e. detainees. [6] Mr. Garcia taught officers that inmates, who are predominantly African-American, are intent on provoking a "racial war" against corrections officers, who are predominantly white. [7] Additionally, lawsuits and a Department of Justice investigation into Mr. Garcia's conduct in other facilities revealed that his training heavily influenced corrections officers even after the training program ended.

37.    So too after the County's contract with CSAU and Mr. Garcia was rescinded, the unconstitutional use of force tactics, including guns that shoot concussive grenades and rubber bullets, have remained in the jail.

## August 2023 Use of Force Incident

38.    Corrections and healthcare staff knew that any incarcerated person at ACJ they engaged with may have a serious mental illness and/or psychiatric disability, given jail administrators' repeated internal and public acknowledgements that ACJ consistently has a substantial population of people with a serious mental illness.

39.    In 2023, jail staff, including all Defendants, knew that the majority of ACJ's population had a psychiatric disability.

40.    Even though the use of chemical agents and the restraint chair had been banned

---

11, July 24, 2021 (*hereinafter* RANEY REPORT), https://www.counton2.com/wp-content/uploads/sites/7/2021/07/raney-use-of-force-analysis-ref-jamal-sutherland-07262021.pdf.
[5] *Id.* at 21-27.
[6] Complaint *Rustgi v. Reams* at 65, No. 1:20-cv-00945 (D. Colo Apr. 3. 2020), ECF No. 1.
[7] Tactical Life Magazine, Aug/Sept. 2020.

from ACJ since the Winter of 2021, ACJ continues to have one of the highest rates of use of force per capita out of all 67 jails in the state.

41.     At ACJ, incarcerated individuals with a psychiatric disability felt the brunt of inappropriate and excessive force. Corrections staff had a practice of not using de-escalation or force avoidance techniques and wrongfully resorted to improper force, especially in response to people experiencing mental health symptoms or in the throes of a mental health crisis. ACJ mental health staff rarely attempted to de-escalate or prevent these unwarranted uses of force or stop them even if contraindicated to the incarcerated person's health.

42.     ACJ administrative, healthcare, and corrections staff, including Defendants, were readily aware that incarcerated people with a psychiatric disability were kept on all housing units at ACJ, including general population housing pods.

43.     ACJ policy does not condone or permit corrections officers to use force in response to an incarcerated person cursing or yelling at corrections or healthcare staff member.

44.     ACJ policy does not condone or permit corrections officers to use of force on an incarcerated person who is handcuffed or restrained.

45.     Mr. Brown has a long history of receiving treatment for his psychiatric disabilities, which he had prior to and at the time of his admission to ACJ in 2022.

46.     Mr. Brown's psychiatric disabilities, which include anxiety disorder, depression, and PTSD, have been exacerbated by multiple traumatic experiences both in and outside of ACJ.

47.     When Mr. Brown was admitted to ACJ, he told ACJ healthcare staff about his prior incarcerations at Schuman Juvenile detention facility and placement facilities where he was held in his youth. While at these facilities, Mr. Brown was diagnosed with psychiatric

disabilities for which he was prescribed mental health medications.

48.     On March 23, 2023, Mr. Brown received a psychiatric evaluation at ACJ. Mr. Brown was diagnosed with adjustment disorder with anxiety. The evaluator documented that Mr. Brown had sleep disturbances and experienced mood swings. The evaluator documented that Mr. Brown's mood was unstable, at times going up and down. The evaluator also documented that Mr. Brown suffered from worrying and racing thoughts daily.

49.     ACJ healthcare staff also diagnosed Mr. Brown with depression and PTSD.

50.     Adjustment disorder with anxiety is recognized as a serious mental health condition and/or psychiatric disability in the DSM-V. Symptoms of the condition include, but are not limited to, excessive worry and nervousness, difficulty concentrating and making decisions, irritability and agitation, and sleep disturbances, among other physical and mental symptoms.

51.     Depression is recognized as a serious mental health condition and/or psychiatric disability in the DSM-V. Symptoms of the condition include, but are not limited to, persistent sadness, loss of interest, fatigue, sleep and appetite disturbances, difficulty concentrating, feelings of worthlessness or guilt, and thoughts of death or suicide, among other physical and mental symptoms.

52.     PTSD is recognized as a serious mental health condition and/or psychiatric disability in the DSM-V. Symptoms of the condition include, but are not limited to, intrusive recurring thoughts or images of the traumatic event (e.g., flashbacks, nightmares), avoidance of reminders, negative changes in thinking and mood (e.g., guilt, fear, detachment), and increased reactivity (e.g., hypervigilance, easily startled, angry outbursts), among other physical and mental symptoms.

53.     On multiple occasions, prior to and at the time of the assaults in August 2023 and January 2024, healthcare staff and corrections officers, including Defendants McKinley and Veith, repeatedly witnessed Mr. Brown receive mental health medications and/or exhibit apparent telltale signs and symptoms of a psychiatric disability, including excessive worry, mood swings, depression, irritability, difficulty concentrating and making decisions, talking to himself, and insomnia.

54.     Instead of providing Mr. Brown with adequate mental health treatment, ACJ staff placed Mr. Brown in solitary confinement and/or gave him misconducts because of his mental health behavior.

55.     In August 2023, Mr. Brown was held at ACJ in general population on 4C.

56.     Later that month, Defendant McKinley and several corrections officers assaulted the restrained Mr. Brown without any penological justification.

57.     Shortly before the August 2023 assault, Mr. Brown lost several relatives in rapid succession, which ACJ staff were aware of. On July 12, 2023, Mr. Brown's cousin died unexpectedly. Sadly, several days later, Mr. Brown's grandmother passed away on July 22, 2023. These unexpected losses while incarcerated exacerbated Mr. Brown's mental health symptoms.

58.     Days before the August 2023 assault, Mr. Brown told Defendant McKinley that he was depressed because his relatives had died recently and asked to be left alone.

59.     Around August 20, 2023, Mr. Brown was waiting in line to receive his mental health medications as he had done routinely throughout his incarceration.

60.     During the medication pass, the nurse distributing medications slapped Mr. Brown's hand, knocking his medications on to the ground.

61.     After the nurse picked them up, she refused to replace Mr. Brown's prescribed medications.

62.     Mr. Brown pleaded for his medication, explaining he suffered from severe anxiety symptoms. When Mr. Brown explained that he was depressed about not receiving his medications and worried about the effect it would have on him, the nurse replied, "I don't give a f--k."

63.     Disregarding Mr. Brown's medical orders, the nurse decided to deny Mr. Brown a replacement medication because she thought he was being rude and demanding, which were non-medical reasons.

64.     As Mr. Brown began to return to his cell, he became emotionally dysregulated, a symptom of his psychiatric disability, and spontaneously yelled and cursed at medical staff and the officers nearby, including Defendant McKinley, who was a housing pod officer for 4C.

65.     Defendant McKinley immediately resorted to using force on Mr. Brown without first attempting de-escalation or other force avoidance techniques.

66.     Defendant McKinley immediately punched Mr. Brown in the face.

67.     Mr. Brown fell to the ground and attempted to defend himself by covering his face and body as Defendant McKinley kicked and punched him.

68.     The medication nurse failed to make any attempt to de-escalate the situation or instruct Defendant McKinley to stop assaulting Mr. Brown even though force was contraindicated to Mr. Brown's mental health condition.

69.     Instead, the medications nurse called for more correction officers to respond.

70.     Very quickly, several other officers, Defendants John Does #1-4, who were apprised that Mr. Brown was emotionally dysregulated during medications pass, rushed onto

the pod.

71.     Even though Mr. Brown was already subdued, lying on the floor with his hands

behind his back, Defendants John Does #1-4 began beating him relentlessly.

72.     Despite Mr. Brown being subdued and exhibiting heightened agitation and

emotional responses consistent with his psychiatric disabilities, Defendants McKinley and John

Does #1-4 continued to punch and kick him.

73.     While Mr. Brown was handcuffed and fully restrained, Defendants McKinley

and John Does #1-4 lifted him off the ground and slammed his face into the walls, stomped on

his head, and continued to beat him.

74.     None of Defendants John Does #1-4 or McKinley attempted to intervene.

75.     When Mr. Brown was eventually taken to the medical housing unit with obvious

injuries and in need for medical attention, medical staff told him that he was "fine" and did not

treat him.

76.     Mr. Brown received a misconduct ticket for the August 2023 assaults for which

he had an internal hearing at ACJ.

77.     The ACJ Hearing Examiner wrongfully sentenced Mr. Brown to solitary

confinement on the Restricted Housing Unit (RHU) for the August 2023 assault even though

the Hearing Examiner knew Mr. Brown was the victim of the defendant officers' unlawful

attacks from reviewing ACJ CCTV surveillance footage of the incidents. The Hearing

Examiner was aware the nurse incited the incident by wrongfully denying Mr. Brown's mental

health medications. Mr. Brown explained to the Hearing Examiner the importance of taking his

prescribed medication and that he experiences adverse sides effects like anxiety attacks and

shouting uncontrollably when he doesn't receive them. The Hearing Examiner knew from

reviewing surveillance footage that Mr. Brown did not present a risk of danger to anyone.

78.     Despite this evidence, the Hearing Examiner still sentenced Mr. Brown to solitary confinement and severely restricted privileges on the RHU on 8E for an unconscionably long duration even though the Hearing Examiner and jail staff knew that Mr. Brown would be at a substantial risk of harm in the RHU, where he would be denied basic human necessities and adequate mental health treatment for his deteriorating health.

79.     Defendants and jail staff viciously punished Mr. Brown while in solitary confinement for no penological purpose. Mr. Brown was kept in a hard cell, which lacked basic human necessities such as recreation, adequate heating, clean clothes, ability to review legal materials, tablet access, and the ability to visit or communicate with friends and family for over a month. Mr. Brown was also forced to sleep on a cold concrete slab without a mattress for several days.

80.     While in solitary confinement, Mr. Brown lost approximately ten pounds, which was documented in his medical records.

81.     When Mr. Brown complained that the RHU conditions were detrimentally affecting his health and asked to be released from solitary, medical staff members claimed that ACJ policy prohibits them from doing so.

82.     Mr. Brown's medical records show that ACJ has a policy and/or practice of prohibiting healthcare staff from removing an individual with psychiatric or physical disabilities from solitary confinement even if those conditions are detrimental to their serious medical or mental health diagnoses. One healthcare professional wrote: "Medical does not alter correction housing." Another healthcare professional similarly wrote that Mr. Brown "is requesting Medical override his RHU status. Inmate was informed that his status is determined by

16

Corrections."

83.     Mr. Brown's health and wellbeing was adversely affected by the conditions of solitary confinement, which significantly disrupted his ability to sleep, eat, and caused him substantial anxiety, intrusive thoughts, and severe depression, among other detrimental symptoms.

84.     Instead of releasing Mr. Brown from solitary, medical staff responded to his excruciating pain with ineffective over-the-counter ibuprofen and failed to provide any therapeutic counseling to allay his worsening symptoms.

85.     Despite Mr. Brown attempting to file written grievances about the assault and reporting it to Internal Affairs ("IA"), neither ACJ nor IA responded.

86.     Although Mr. Brown was eventually released from the RHU, his time in solitary confinement exacerbated Mr. Brown's psychiatric disabilities, causing him nightmares, sleepless nights, and racing thoughts, increased paranoia, among other symptoms.

## January 2024 Use of Force Incident

87.     Around January 3, 2024, Mr. Brown was assaulted again by ACJ corrections officers.

88.     While officers were doing routine window checks on 6F, Defendants Veith and Radaci singled out Mr. Brown to search his cell.

89.     Defendant Veith had not searched any other cell during the window check.

90.     Defendants Veith and Radaci instructed Mr. Brown to go into his cell.

91.     Mr. Brown was shuffling cards at the time and asked if he could at least put his shoes on before the officers entered.

92.     Defendant Veith refused Mr. Brown's request.

93.     Defendant Veith told Mr. Brown to go into the cell so he could "f--k him up."

94.     Mr. Brown became increasingly anxious as he feared the imminent unjustified beating. Mr. Brown's mental health symptoms overcame him, leading to a loss of emotional regulation and impulse control, as he uncontrollably yelled and cursed at Defendants Veith and Radaci.

95.     At no point during his verbal outburst did Mr. Brown attempt to assault Defendants Veith and Radaci or anyone else.

96.     Even though Mr. Brown was having an apparent mental health crisis and exhibiting symptoms of emotional dysregulation and loss of impulse control consistent with his psychiatric disability, Defendants Veith and Radaci did not attempt to de-escalate or implement other force avoidance techniques.

97.     Instead, Defendant Veith entered Mr. Brown's cell and repeatedly punched Mr. Brown in the face.

98.     Instead of intervening and stopping the assault, ACJ supervisor Defendant Radaci tased Mr. Brown without justification.

99.     Even though Mr. Brown was already subdued, as he was prone on the ground with his arms behind his back, Radaci still tased Mr. Brown in the back using the prong electrocution feature.

100.    The tasing was prolonged and excruciating.

101.    Defendant Veith continued to punch Mr. Brown while he was on the ground and unable to move from the tasing.

102.    ACJ healthcare staff are the only workers who are authorized to remove taser

18

prongs.

103.    Nevertheless, Defendant John Doe #5, a corrections officer, improperly ripped the taser's prongs out of Mr. Brown's back, causing serious bleeding.

104.    Following the assault, ACJ officials punished Mr. Brown by denying him proper medical clearance and instead placing him in solitary confinement for nearly two weeks.

105.    Per ACJ policy and practice, Supervisory Defendants reviewed the use of force packet and watched the surveillance video on the day of Mr. Brown's assault.

106.    Even though ACJ officials and County Police confirmed that the surveillance video showed that Defendant Veith's assault was unlawful, ACJ initially accused Mr. Brown of fighting, gave him a misconduct, and kept him in solitary confinement.

107.    Once again, the Hearing Examiner punished Mr. Brown for being the victim of excessive force by ACJ officer even though the Hearing Examiner knew and had access to ACJ CCTV surveillance video clearly showing that Defendants Radaci and Veith beat Mr. Brown mercilessly without any reasonable justification. Nevertheless, the Hearing Officer improperly sentenced Mr. Brown to solitary confinement in the RHU, where he was denied minimal basic civilized necessities while he served his time.

108.    Only days after needlessly suffering in solitary, ACJ officials finally found Mr. Brown not guilty of fighting–a fact that should have been apparent upon the initial review of the video, and dismissed the misconduct.

**County Police Charged Defendant Veith for Assaulting Mr. Brown**

109.    Around March 11, 2024, the Allegheny County Police, issued an official

statement confirming Mr. Brown's account that Defendant Veith's brutal assault was excessive,

without provocation, and flagrantly unlawful.

110.    The Allegheny County Police stated that ACJ "[s]urveillance video showed

Veith talking" with Mr. Brown and that "[d]uring their conversation, Veith reached out and

struck the man with his fist multiple times."[8] The Police stated that "[a] responding supervisor,"

Defendant Radaci, then tased Mr. Brown in the back while "Veith continued to strike him after .

. . [he] had fallen to the ground."[9]

111.    As ACJ officials are readily aware that tasing can cause serious injuries to

victims.

112.    The electrical impulse from a taser travels to the person's nerves, causing him

sustained muscle contractions, which can lead to neuromuscular incapacitation. This is a state

where the body loses muscle control by disrupting the communication between the brain and

muscles. This causes involuntary muscle contractions and, in some cases, ventricular

fibrillation—a life-threatening heart rhythm disturbance where the heart's lower chambers

quiver chaotically, preventing the heart from pumping blood and leading to cardiac arrest and

---

[8] STATEMENT OF THE ALLEGHENY COUNTY POLICE, CHARGES FILED AGAINST FORMER ALLEGHENY
COUNTY JAIL CORRECTIONS OFFICER, (March 11, 2024); *see also* Justin Vellucci, *Guard Punched Inmate in
Allegheny County Jail Cell, Police Say*, TRIBLIVE, (March 11, 2024, 11:35 A.M.),
https://triblive.com/local/plum/guard-punched-inmate-in-allegheny-county-jail-cell-police-say/; Tom Garris,
*Ex-Corrections Officer at Allegheny County Jail Charged, Accused of Striking Inmate*, WTAE, (March 11,
2024, updated 6:44 P.M.), https://www.wtae.com/article/allegheny-county-jail-corrections-officer-
charges/60163059.
[9] STATEMENT OF THE ALLEGHENY COUNTY POLICE, CHARGES FILED AGAINST FORMER ALLEGHENY
COUNTY JAIL CORRECTIONS OFFICER, (March 11, 2024).

possibly death.

113.    Tasers have been reported to cause damage to the nervous system, potentially affecting nerve function and causing other permanent injuries. Despite their knowledge of the risks of injuries from tasing and physical assaults and Mr. Brown's symptoms of nerve impairment, ACJ officials have been deliberately indifferent to Mr. Brown's medical needs and completely disregard his reasonable requests to be examined for nerve damage.

114.    Mr. Brown has repeatedly reported to ACJ staff, without avail, that he continues to experience numbness, pain, and tingling sensations in both of his legs from the waist down.

115.    Nevertheless, ACJ denied Mr. Brown physical therapy, adequate pain relievers, and failed to assess his pain management needs.

116.    Additionally, Mr. Brown continues to suffer psychologically from the trauma of being tased, which is confirmed by ACJ medical staff.

117.    In February 2024, a medical practitioner reported that "Mr. Brown is still having anxiety." "His sleep is also restless. [He] [has] [t]rouble falling asleep, and when he wakes up around 2am, he is unable to fall back asleep."

118.    In March 2024, a nurse reported that Mr. Brown has "[n]ightmares at times . . . about being tased."

119.    The anxiety, depression, and PTSD symptoms Mr. Brown is experiencing are significantly affecting his ability to function and complete daily activities.

120.    ACJ has also completely failed to provide Mr. Brown with standard therapeutic counseling to treat his ongoing mental health symptoms.

**<u>Supervisory Defendants' Involvement in Use of Force Policies and Practices</u>**

121.    As Warden, Defendant Harper was at all relevant times, responsible for the oversight of ACJ, which included promulgating and enforcing policies, practices, and procedures concerning mental health, discipline, use-of-force, officer training, and ensuring accommodations for incarcerated people with physical or psychiatric disabilities. Defendant Harper also had the authority to discipline officers.

122.    As Interim Warden, Defendant Dady was from September 2023 to November 2024, and at all relevant times, responsible for the oversight of ACJ, which included promulgating and enforcing policies, practices, and procedures concerning mental health, discipline, use-of-force, officer training, and ensuring accommodations for incarcerated people with physical or psychiatric disabilities. Defendant Dady also had the authority to discipline officers.

123.    As the Deputy Warden of Operations, Defendant Beasom was at all relevant times responsible for the oversight and administration of correctional officers and for promulgating and enforcing policies, practices, and procedures concerning use-of-force and officer training. Defendant Beasom also has the authority to discipline officers.

124.    Due to the Supervisory Defendants' policies and practices, Plaintiff was subjected to unconstitutional force by Defendants John Does #1-4 and McKinley.

125.    Supervisory Defendants were aware of and failed to prevent ACJ officers' routine use of force, such as brutal force and assaults to punish people with psychiatric disabilities for requesting mental health care and for non-violent acts that are manifestations of their serious mental illnesses.

126.    When ACJ corrections officers used force on incarcerated persons, including those with psychiatric disabilities, Supervisory Defendants learned of those incidents in detail in various ways, including through use-of-force reports and videos recording the incident, written and oral complaints by the incarcerated person against whom force was used, ACJ's internal affairs investigations, and by state mandated reporting requirements on ACJ's use-of-force data.

127.    For every incident where an officer uses force, including physical assaults, use of tasers, Keltech shot guns, or control techniques and pain compliance, ACJ policy requires the officer who applied the force and every officer who witnessed or was involved in the use of force to submit a written report of the incident by the end of their shift.

128.    ACJ policy requires officers to include in their written report pertinent information about the incident necessary to allow the reviewer to assess the appropriateness of the force used, including the date, time, and location of the incident, an account of the events leading to the use of force, a complete description of the incident and reasons for employing force, a description of the method by which force was applied, including security equipment and weapons used, a description of the incarcerated person's resulting injuries, and other relevant information. The ACJ shift commander and/or immediate supervisor assembles all reports into a packet and sends them, along with a video of the incident and other materials, to the ACJ majors and internal affairs, which includes Supervisory Defendants.

129.    As the Deputy Warden of Operations, Defendant Beasom reviewed and determined if the officers' use force was reasonable and whether any remedial measures needed to be taken, including discipline of the officer(s) involved. Upon information and belief, Defendants Harper, Dady, and Beasom reviewed use-of-force incidents and participated in determining whether to take corrective action for subordinate officer's conduct.

130.    The Pennsylvania Department of Corrections ("PA DOC") administrative code and ACJ's statistical reporting policy requires that ACJ document and report monthly the number of times officers used any type of force to the PA DOC and the Allegheny County Bureau of Corrections Department.

131.    Supervisory Defendants have refused to change ACJ's policies and practices in a way that prevents or ameliorates the unnecessary and inappropriate use of force against those with psychiatric disabilities.

132.    Defendants have acted wantonly, willfully and in reckless disregard of Mr. Brown's rights.

**COUNT I:  Fourteenth Amendment – Excessive Use of Force – Against Defendants John Does #1-4 and McKinley**

133.    All paragraphs are incorporated herein.

134.    Around August  2023, Defendants John Does #1-4's decision to join Defendant McKinley in punching and kicking Mr. Brown in the face and body when Mr. Brown was restrained, mentally distressed, outnumbered by approximately five armed officers, and did not present any threat of harm, instead of refraining from using force, attempting a lesser means of force, using de-escalation techniques, or seeking mental health intervention, constituted harmful force that was objectively unreasonable in violation of the Fourteenth Amendment.

**COUNT II: Fourteenth Amendment – Failure to Intervene – Against Defendants John Does #1-4 and McKinley**

135.    All paragraphs are incorporated herein.

136.    Mr. Brown had a right under the Fourteenth Amendment, including to be free of corrections officers using excessive force on him without penological justification.

137.    Around August 2023, Defendants John Does #1-4 and McKinley used

24

unreasonable force when they physically assaulted Mr. Brown while he was mentally distressed and did not present any threat of harm to anyone.

138.    Defendants John Does #1-4 each had a duty to intervene to prevent the use of excessive force by fellow John Does and Defendant McKinley when they unreasonably assaulted the restrained Mr. Brown without provocation.

139.    Defendant McKinley had a duty to intervene to prevent the use of excessive force by fellow Defendants John Does #1-4 when they continued to unreasonably assault the already restrained Mr. Brown.

140.    Defendants John Does #1-4 and McKinley had a reasonable opportunity to intervene and stop the unlawful assaults on Mr. Brown but failed to intervene.

**COUNT III: Fourteenth Amendment – Conditions of
Solitary Confinement Against Allegheny County,
Supervisory Defendants**

141.    All paragraphs are incorporated herein.

142.    Mr. Brown has serious mental illnesses that Defendants and jail officials were actually aware of prior to and while he was wrongfully held in solitary confinement following each of the corrections officers' assaults in 2023 and 2024.

143.    Defendants knew from Mr. Brown's complaints, medical records, OMSE system and other sources that by placing and keeping Mr. Brown in solitary confinement where he was denied out-of-cell time, social interaction, basic human necessities like hygienic items, adequate heating, clean clothes, and confidential psychiatric treatment were detrimental conditions that were contraindicated to Mr. Brown's medical and mental health needs and put him at risk of serious harm.

144.    Defendants knew they and/or jail officials were failing to comply with the

Allegheny County Referendum banning solitary confinement as it applied to Mr. Brown, which was passed after a public campaign against the widely-acknowledged harms of solitary confinement.

145.    Mr. Brown repeatedly told ACJ staff that the conditions in solitary confinement on the RHU were detrimentally affecting his medical and mental health symptoms and asked to be released from solitary. On several occasions, healthcare staff told Mr. Brown and documented in his ACJ medical record that per ACJ policy only corrections can determine when to place or remove an inmate from solitary confinement. Healthcare staff members said they could not alter or override corrections' decision to put Mr. Brown on RHU status even if the conditions were contraindicated to his serious healthcare needs.

146.    Defendants were deliberately indifferent to the risk of harm to Mr. Brown's serious mental health needs, including but not limited to anxiety and depression, which would be seriously exacerbated when he was placed in solitary confinement, causing him harm in violation of the Fourteenth Amendment.

### COUNT IV: Fourteenth Amendment – Excessive Force
### Against Defendants Veith, Radaci,
### and John Doe#5

147.    All paragraphs are incorporated herein.

148.    Around January 3, 2024, Defendant Veith's act of repeatedly punching Mr. Brown in the face, even after he was subdued by a taser and presented no threat to anyone, was objectively unreasonable and violated Mr. Brown's Fourteenth Amendment rights.

149.    Defendant Radaci violated Mr. Brown's Fourteenth Amendment rights by using objectively unreasonable force when he delivered a prolonged tasing to Mr. Brown's back while Mr. Brown was subdued, prone on the ground, and still being assaulted by Defendant Veith.

The tasing caused Mr. Brown excruciating pain and potential nerve damage.

150.     Defendant John Doe #5's act of removing taser prongs from Mr. Brown despite his knowledge that only healthcare workers could do so given the possibility that improper prong removal could and did cause Mr. Brown unnecessary and painful injuries, was objectively unreasonable force in violation of Mr. Brown's Fourteenth Amendment rights.

**COUNT V: Fourteenth Amendment – Failure to Intervene – Against Defendant Radaci**

151.     Around January 3, 2024, Defendants Veith, Radaci, and John Doe #5 violated Mr. Brown's Fourteenth Amendment rights.

152.     Defendant Radaci had a duty to intervene to prevent the use of excessive force by a fellow officer.

153.     Defendant Radaci had a reasonable opportunity to intervene and prevent and/or stop Defendant Veith's unlawful assault on Mr. Brown. Instead, Defendant Radaci chose to use that time to allow Defendant Veith to continue his unjustified assault on Mr. Brown. Defendant Radaci also took this opportunity to tase Mr. Brown in the back.

154.     Defendant Radaci had a reasonable opportunity to intervene and prevent Defendant John Doe #5 from improperly ripping out the taser prongs from Mr. Brown's back but instead chose not to intervene.

155.     Defendant Radaci's failure to intervene in Defendants Veith's and John Doe #5's use of excessive force on Mr. Brown contributed to his physical injuries and psychiatric trauma.

**COUNT VI: Fourteenth Amendment – Supervisory Liability Against Defendants Harper, Dady, and Beasom**

156.     All paragraphs are incorporated herein.

157.    Supervisory Defendants Harper, Dady, and Beasom are liable for their personal involvement in failing to train, supervise, and discipline Defendants John Does #1-4, John Doe #5, McKinley, Radaci, and Veith as well as other corrections officers who assaulted incarcerated individuals with disabilities and resulted in the deprivation of these inmates' and Mr. Brown's right to be free from cruel and unusual punishment under the Fourteenth Amendment to the Constitution.

158.    Supervisory Defendants were aware that a high proportion of ACJ's population are individuals with psychiatric disabilities.

159.    Supervisory Defendants authorized, approved of, ratified, and/or condoned corrections officers for using disproportionate force for minor, non-violent infractions against inmates, including those with psychiatric disabilities.

160.    Supervisory Defendants have acted with objective unreasonableness and/or deliberate indifference to the need to train ACJ corrections officers, including Defendants John Does #1-4, John Doe #5, McKinley, Radaci, and Veith, on how to manage and interact with individuals with psychiatric disabilities despite knowing that the lack of train causes serious risks of harm to those with psychiatric disabilities.

161.    The training that Supervisory Defendants failed to provide to corrections officers, including Defendants John Does #1-4, John Doe #5, McKinley, Radaci, and Veith included but was not limited to:

- Training to ensure force was only used when necessary, and was not used excessively, unreasonably, or in situations that could be resolved without the use of force;

- Training on how to recognize behaviors and patterns of behavior that are

indicative of psychiatric disability;

- Training on how to determine when conduct may be a manifestation of an incarcerated person's psychiatric disability, and thus require treatment rather than punishment;

- Training on how to de-escalate conflict with individuals who have psychiatric disabilities; and

- Training on the importance and necessity of consulting with mental health staff when an incarcerated person with psychiatric disability was engaging in problematic behavior, rule violations, or was manifesting symptoms of their serious mental health condition that suggested the need for intervention.

162.    Defendants' failure to train officers, including Defendants John Does #1-4, John Doe #5, McKinley, Radaci, and Veith, caused the unlawful assaults on Mr. Brown in violation of the Fourteenth Amendment of the Constitution of the United States.

163.    Supervisory Defendants acted with deliberate indifference and/or objective unreasonableness to the obvious consequences by failing to train and prevent officers, including Defendants John Does #1-4, John Doe #5, McKinley, Radaci, and Veith, from using excessive force on individuals with psychiatric disabilities, despite their knowledge of the extensive history of correctional officers using unreasonable force on this population, and that it was highly likely and predictable that untrained officers would continue to use excessive force on individuals with disabilities without further training, supervision, or discipline.

164.    Supervisory Defendants knew it was substantially likely that Defendants John Does #1-4, John Doe #5, McKinley, Radaci, and Veith would assault individuals like Mr. Brown because, upon information and belief, these correction officers had a pattern of using

unlawful force against similarly situated persons with disabilities.

165.    Supervisory Defendants also knew it was substantially likely that Defendants John Does #1-4, John Doe #5, McKinley, Radaci, and Veith would assault individuals like Mr. Brown because of ACJ's deficient use of force and mental health policies and trainings, their condoning of ACJ's historic use of excessive force on persons with psychiatric disabilities, and Supervisory Defendants' failure to adequately train, supervise, or discipline officers for using force that contravened the law, correctional standards, and policies.

166.    Supervisory Defendants' failures to supervise Defendants John Does #1-4, John Doe #5, McKinley, Radaci, and Veith and to redress the risk of a constitutional violation caused Mr. Brown's right to be free from cruel and unusual punishment under the Fourteenth Amendment to the Constitution to be violated.

167.    Supervisory Defendants failed to adequately train, supervise, or discipline ACJ corrections supervisors, who were responsible for reviewing use force incidents. Supervisory Defendants knew the supervisors conducting these reviews would confront situations such as an officer using excessive force in response to an inmate's non-violent mental health symptoms and that correction officers and the reviewing supervisors had a history of mishandling these incidents at ACJ. Supervisory Defendants also knew the wrong choice—i.e. the approval of unlawful force—by a reviewing supervisor would frequently cause a deprivation of an incarcerated person's right to be free from excessive force under the Fourteenth Amendment because the offending corrections officer, who used force excessively, unjustifiably, or in a manner that contradicted correctional standards and ACJ training, would not be retrained, given more supervision, or disciplined, but rather permitted to continue to use unconstitutional force against inmates with disabilities..

**COUNT VII: Americans with Disabilities Act, 42 U.S.C. §12132-**
**Against Defendant Allegheny County**

168.    All paragraphs are incorporated herein.

169.    Defendant Allegheny County is a public entity within the meaning of 42 U.S.C. §12131.

170.    Mr. Brown is a qualified individual with disabilities within the meaning of Title II of the Americans with Disabilities Act ("ADA"). Mr. Brown is diagnosed with anxiety, depression, and PTSD.

171.    Defendant Allegheny County, and its employees and contractors, knew that Mr. Brown was an individual with disabilities covered by the protections of the ADA.

172.    Despite this knowledge, Allegheny County and its employees and contractors failed to provide Plaintiff with any reasonable accommodation for his disabilities.

173.    Such reasonable accommodations for Mr. Brown's psychiatric disabilities include, but are not limited to, the provision of training to ACJ staff on recognizing when a person's behavior is a manifestation of their psychiatric disability, how to interact with people who have psychiatric disabilities so as to de-escalate situations, and the contraindications of use of force on individuals with psychiatric disabilities as well as enacting policies mandating the intervention of mental health staff before and during the use of any force or discipline on individuals with psychiatric disabilities.

174.    Allegheny County further failed to provide reasonable accommodations to Mr. Brown by not replacing his prescribed mental health medication.

175.    Allegheny County discriminated against and failed to provide reasonable accommodations to Mr. Brown by not preventing ACJ corrections staff from using excessive of

force on Mr. Brown because of his mental health disability.

176.    Allegheny County maintained an unlawfully discriminatory policy and/or practice that prohibited healthcare staff from overriding corrections' decisions to place or retain inmates with physical and/or psychological disabilities in solitary confinement even if the inhumane conditions and deprivation of privileges were contraindicated to and risked harming the inmate's serious medical or mental health needs.

177.    Allegheny County discriminated against and failed to provide reasonable accommodations to Mr. Brown by placing and keeping him in solitary confinement on an RHU pod as punishment for his mental health episodes during the August 2023 and January 2024 assaults.

178.    Allegheny County discriminated against and failed to provide reasonable accommodations to Mr. Brown by placing and keeping him in solitary confinement despite knowing Mr. Brown risked decompensating because he would be denied access to adequate mental health treatment and other ACJ benefits, programs, services, and activities that were available to inmates without disabilities on non-RHU pods.

179.    Allegheny County acted with deliberate indifference to the risk of violating Mr. Brown's federally protected rights under the Americans With Disabilities Act by permitting, authorizing, acquiescing in, causing, and otherwise enabling corrections staff to use force against Mr. Brown, who has psychiatric disabilities, in response to non-violent and non-threatening behavior that were manifestations of his mental health conditions.

180.    As a direct and proximate result of the aforementioned acts, including but not limited to Defendant Allegheny County's deliberate indifference to the violations of Mr. Brown's federally protected rights, Mr. Brown has suffered and continues to suffer great pain, humiliation,

and mental and emotional distress.

**COUNT VIII: Fourteenth Amendment – Defendant's Deliberate Indifference to Plaintiff's Serious Medical Needs-Against Allegheny County, Supervisory Defendants**

181.   All paragraphs are incorporated herein.

182.   Mr. Brown had serious medical needs to treat his physical and psychiatric injuries caused by ACJ corrections staff members' unlawful assaults in August 2023 and January 2024.

183.   At all relevant times, Defendants Allegheny County and Supervisory Defendants were responsible for authorizing, promulgating, condoning, acquiescing in, and implementing policies and practices affecting the provision of medical and mental health services for incarcerated people who had been tased and/or physically beaten at ACJ. These acts and or omissions included but were not limited to permitting or authorizing improper removal taser prongs by non-medical staff, inadequate physical and/or psychiatric examination, the denial of diagnostic testing to assess the severity of the physical beating and/or tasing injuries, inadequate treatment for nerve damage and/or other injuries resulting from corrections' tasing and/or physical beatings, inadequate psychiatric counseling, and the denial of physical therapy. Defendant Allegheny County knew these policies and/or practices were injurious to Mr. Brown because they denied him adequate treatment for his serious medical and mental health needs in violation of his Fourteenth Amendment rights.

184.   At all relevant times, Defendants Allegheny County and Supervisory Defendants were responsible for authorizing, promulgating, condoning, acquiescing in, and implementing policies and/or practices affecting the provision of medical services for incarcerated people with serious medical and/or mental health needs, which included but was not limited to ensuring inmates were not denied their prescribed medications for their medical and/or mental health conditions.

185.    In August 2023, a nurse at the ACJ who was responsible for distributing medications on Mr. Brown's housing pod 3B, dropped his mental health medicine on the floor. After the nurse picked them up, she refused to replace Mr. Brown's medication.  Mr. Brown pleaded with the nurse, explaining he was prescribed the medication because he suffered from severe anxiety symptoms. The nurse refused Mr. Brown's request because she thought he was being rude and demanding, which was an impermissible non-medical reason to deny prescribed medication in violation of Mr. Brown's Fourteenth Amendment rights.

186.    Defendants Allegheny County and Supervisory Defendants violated Mr. Brown's right to be free from cruel and unusual punishment under the Fourteenth Amendment of the U.S. Constitution by Defendants failing to adequately instruct, train, supervise, or discipline ACJ healthcare workers for denying prescribed medication to incarcerated people, including Mr. Brown, for non-medical reasons, and despite knowing that depriving said medications subjected inmates to a substantial risk of harm to their serious medical and/or mental health needs. Defendants Allegheny County and Supervisory Defendants' acts and omissions were objectively unreasonable and demonstrated deliberate indifference to Mr. Brown's serious medical needs, which ultimately caused him unnecessary physical and mental pain and suffering.

187.    Defendant Allegheny County and Supervisory Defendants knew that Mr. Brown suffered injuries caused by corrections officers assaulting him in August 2023 and January 2024. Defendant Allegheny County also knew that Defendant Radaci's tasing of Mr. Brown and Defendant John Doe #5's improper removal of the taser prongs from Mr. Brown's back caused Mr. Brown injuries. Defendant Allegheny County and Supervisory Defendants knew that not providing Mr. Brown effective treatment for his injuries from these two assaults resulted in denying him healthcare for his serious medical need and put him at a substantial risk of harm, and endangered

34

his health and safety. Mr. Brown continues to experience numbness and sharp pains from the tasing and has been denied repeated requests for diagnostic testing to assess the severity of his injuries and adequate pain relievers. Mr. Brown also continues to experience anxiety attacks and PTSD episodes that are triggered by the August 2023 and January 2024 assaults.

188.    Defendant Allegheny County and Supervisory Defendants failed to adequately instruct, train, or discipline ACJ corrections staff for removing taser prongs from incarcerated people.

189.    Defendant Allegheny County and Supervisory Defendants had actual knowledge of Mr. Brown's injuries from the unlawful assaults, including the tasing, and the harm caused to Mr. Brown by ACJ's deficient medical care, due to Mr. Brown notifying Defendants through sick calls, his conversations with healthcare professionals at ACJ, through the grievance process, a detailed letter about the assaults that was emailed to jail officials, and ACJ internal and external use of force reviews by IA and the County Police.

190.    Defendant Allegheny County was deliberately indifferent to, and its acts and omissions were objectively unreasonable to, Mr. Brown's serious medical needs, which caused him unnecessary pain and suffering for his physical and psychiatric injuries.

**COUNT IX: Fourteenth Amendment – Section 1983 Municipal
Liability Claims Against Allegheny County**

191.    All paragraphs are incorporated herein.

192.    Supervisory Defendants were policymakers for ACJ.

193.    Policymakers were aware of the disproportionately high number of uses of force at Allegheny County Jail.

194.    Policymakers were aware that unreasonable and excessive force was routinely

35

used at the Allegheny County Jail against incarcerated individuals.

195.    Policymakers were aware that unreasonable and excessive force was routinely used at the Allegheny County Jail against people with psychiatric disabilities.

196.    Prior lawsuits were filed against Allegheny County before the 2023 and 2024 assaults alleging excessive uses of force, including lawsuits alleging supervisory liability and class action claims regarding widespread patterns of excessive force.

197.    Policymakers were deliberately indifferent to the highly predictable fact that unreasonable and excessive force would continue to be used at the Allegheny County Jail, including against individuals with psychiatric disabilities.

198.    Policymakers made a deliberate choice to adopt policies concerning the use of force that they knew may cause a violation of the federal rights of incarcerated persons with disabilities at ACJ.

199.    Policymakers knew or should have known of a widespread and well-settled practice of corrections officers using excessive force and/or fellow or superior officers failing to intervene.

200.    The absence of an official policy for de-escalation and/or intervention increased the likelihood that excessive force would be used against incarcerated individuals.

201.    Policymakers knew or should have known of a widespread and well-settled practice of healthcare staff refusing, denying, or unduly delaying inmates' prescribed medication for non-medical reasons that put inmates at a substantial risk of harm.

202.    Policymakers knew or should have known that healthcare providers consistently failed to implement de-escalation and force avoidance techniques on inmates with psychiatric disabilities or those experiencing a mental health crisis. Policymakers knew or should have

known that healthcare providers frequently requested or acquiesced in corrections using unnecessary or excessive force against inmates when it was contraindicated to the medical or mental health needs of the inmate.

203.    Policymakers knew or should have known of a widespread and well-settled practice that ACJ supervisors acquiesced in, approved of, condoned, or ratified misconducts and hearing dispositions against inmates regardless of the type of alleged infraction and even if the evidence was insufficient or non-existent to support the charge, but they failed to provide adequate training, supervision, or oversight.

204.    Policymakers knew or should have known of a widespread and well-settled ACJ policy and/or practice where ACJ supervisors acquiesced in, approved of, ratified, condoned, and/or authorized corrections staff members as the only jail workers with the authority to place, retain, or release inmates from solitary confinement. Healthcare staff were prohibited from overriding corrections' solitary confinement decisions. Healthcare staff could not release inmates from solitary without corrections' approval even if the inhumane conditions and lack of privileges were contraindicated to the inmate's medical or mental health needs. Policymakers and supervisors were deliberately indifferent to inmates by permitting this policy and/or practice despite their knowledge that inmates' medical and/or mental health were subjected to a substantial risk of serious harm while in solitary confinement.

205.    Policymakers' inadequate policy, practice, training, and supervision was taken with deliberate indifference to the known and obvious consequences. They were the cause and moving force behind the violation of Mr. Brown's right to be free from cruel and unusual punishment under the Fourteenth Amendment to the Constitution.

206.    Municipality's training program for officers and/or supervisors was inadequate to

train them in carrying out their duties.

207.    Municipality failed to adequately supervise corrections officers and/or supervisors concerning use of force, disciplining corrections staff for conduct that is unlawful or prohibited by ACJ policies and/or practices, placement in solitary confinement, and the distribution of prescribed medications.

208.    Municipality's failure to adequately train corrections officers and/or supervisors amounted to deliberate indifference to the fact that inaction would obviously result in a violation of incarcerated person's right to be free from cruel and unusual punishment under the Fourteenth Amendment to the Constitution.

209.    Municipality's failure to adequately train and/or adequately supervise Defendants proximately caused the deprivation of Mr. Brown's right to be free from cruel and unusual punishment under the Fourteenth Amendment to the Constitution.

210.    Policymaking officials knew corrections officers and supervisors would confront situations such as the use of force in response to an inmate's non-violent mental health symptoms that correction officers had a history of mishandling. Policymakers knew or should have known the wrong choice by a corrections officer and/or supervisor would frequently cause a deprivation of an incarcerated person's right to be free from cruel and unusual punishment under the Fourteenth Amendment to the Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A.    Award Plaintiff compensatory, special, and punitive damages on all claims;

B.    Grant attorneys' fees and costs;

C.    Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury with respect to all matters and issues properly triable by a jury.

Respectfully submitted,

O'Brien Coleman & Wright, LLC

/s/ Alec B. Wright
Alec B. Wright
Pa. ID No. 316657

116 Boulevard of the Allies
Pittsburgh, Pennsylvania 15222

(412) 260-1662
alec@ocwjustice.com

and

ABOLITIONIST LAW CENTER
/s/ Jaclyn Kurin
Jaclyn Kurin
D.C. ID No. 1600719
(*admitted pro hac vice*)
Bret Grote
Pa. ID No. 317273
Dolly Prabhu
PA I.D. No 328999
P.O. Box 23032
Pittsburgh, Pennsylvania 15222
(730) 850-8914
jkurin@alcenter.org
bretgrote@alcenter.org
dprabhu@alcenter.org